RAFEY S. BALABANIAN (SBN – 315962)
rbalabanian@edelson.com
J. AARON LAWSON (SBN – 319306)
alawson@edelson.com
EDELSON PC
123 Townsend Street, Suite 100
San Francisco, California 94107
Telephone:  (415) 212-9300
Facsimile:  (415) 373-9435

*Attorneys for Plaintiff*

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

## WESTERN DIVISION

| | |
|---|---|
| JOESPH LACK, individually and on behalf of all others similarly situated, | Case No. |
| *Plaintiff*, | **COMPLAINT** |
| v. | |
| MIZUHO BANK, LTD., a Japanese financial institution, and MARK KARPELES, an individual, | DEMAND FOR JURY TRIAL |
| | **CLASS ACTION** |
| *Defendants*. | |

COMPLAINT

Plaintiff, Joseph Lack ("Plaintiff") brings this Class Action Complaint and Demand for Jury Trial against Defendants Mark Karpeles ("Karpeles") and Mizuho Bank, Ltd. ("Mizuho"). Plaintiff alleges as follows upon personal knowledge as to himself and his own acts and experiences, and, as to all other matters, upon information and belief, including investigation conducted by his attorneys.

## NATURE OF THE ACTION

1.      This case involves the demise of the Mt. Gox Bitcoin Exchange ("Mt. Gox" or the "Exchange") and the loss of hundreds of millions of dollars worth of its users' bitcoins and cash ("Fiat") Currency. Defendant Mark Karpeles, who owned and ran Mt. Gox, was responsible for the loss of more than $400 million from users on the Exchange through either gross negligence or outright theft. Plaintiff brings suit on behalf of a class of similarly situated individuals to recover their resulting losses from Karpeles.

2.      Although Karpeles is the most notorious actor in the Mt. Gox collapse, Mt. Gox's banking partner, Defendant Mizuho Bank, bears significant responsibility as well. As discussed below, in mid-2013, Mizuho created a number of artificial hurdles in hopes of forcing Mt. Gox to sever relations with it. The most significant of these hurdles was to stop processing any withdrawal requests made by Mt. Gox users in the United States, thus making it virtually impossible for United States users to withdraw any money from their Mt. Gox accounts. In this sense, Mizuho was akin to the famous Hotel California, money could check into the bank at any time, but once there, it could never leave.

3.      Mizuho actively worked to hide what it was doing from Mt. Gox's consumers, knowing both that its actions exposed it to reputation harm and that if Mt. Gox's customers knew how broken Mizuho's relationship with Mt. Gox was—and that they would be essentially unable to withdraw their money—no United States user would deposit money into Mt. Gox and Mizuho would be deprived of the

transaction fees associated with such deposits. Plaintiff thus also brings suit on behalf of a subclass of similarly situated individuals who were duped into depositing money into Mt. Gox after Mizuho made the decision to stop allowing withdrawals.

## PARTIES

4. Plaintiff Joseph Lack is a natural person and citizen of the State of California.

5. Defendant Mark Karpeles is a natural person and citizen of the country of France. During the events alleged in this Complaint, Karpeles served as the Chief Executive Officer of both Mt. Gox KK and its parent company, Tibanne KK. Additionally, Karpeles is the sole shareholder of Tibanne KK. Based on Mt. Gox's own statements, "Mark Karpeles is the President and CEO of both MtGox and Tibanne. Mark providers [sic] overall direction, responsible for supervising main operations and steering the company according to his vision." Through Tibanne KK and the Mt. Gox Exchange, Karpeles conducted business throughout this District, the State of California, and the United States.

6. Defendant Mizuho Bank is a Japanese financial institution with its principal headquarters located at 1-3-3, Marunouchi, Chiyoda-ku, Tokyo, Japan 100-8210. Mizuho Bank conducts business worldwide, including throughout in this District (where it has a branch office), the State of California, and the United States. Mizuho Bank has received and processed wire money deposits and withdrawals for Mt. Gox customers residing in this District, the State of California, and the United States.

## JURISDICTION AND VENUE

7. This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332(d)(2) because (i) at least one member of the Classes is a citizen of a different state than Defendants, (ii) the amount in controversy exceeds $5,000,000, exclusive of interest and costs, and (iii) none of the exceptions under that subsection apply to

1   this action.

2       8.    This Court has personal jurisdiction over Defendants because they

3   conduct business in this District and the unlawful conduct alleged in the Complaint

4   occurred in, was directed to, and/or emanated from this District.

5       9.    Venue is proper in this District under 28 U.S.C. § 1391(b) because a

6   substantial part of the events or omissions giving rise to the unlawful conduct alleged

7   in the Complaint occurred in, was directed to, and/or emanated from this District.

8                    **COMMON FACTUAL ALLEGATIONS**

9   ***The Mt. Gox Bitcoin Exchange.***

10      10.   Founded in 2009, Mt. Gox at one time claimed to be the "world's most

11  established Bitcoin exchange." In addition to buying and selling bitcoins, Mt. Gox

12  promised its customers "the ability to securely store Bitcoin in a virtual 'vault' for

13  safe keeping" on its servers. It further promised that its website would be "always

14  on" so that users could "[b]uy and sell Bitcoin 24/7/365 with the world's most

15  sophisticated trading platform."

16      11.   To use Mt. Gox's service, customers were required to sign up for an

17  account at www.mtgox.com and agree to Mt. Gox's Terms of Use, which expressly

18  stated that "MtGox represents and warrants that . . . it will hold all monetary sums

19  and all Bitcoins deposited by each Member in its Account, in that Member's name as

20  registered in their Account details, and on such Member's behalf."

21      12.   Customers were also asked to verify their accounts by providing Mt.

22  Gox with detailed information, such as their full name, date of birth, country of birth,

23  physical address, and proof of identity (such as a state issued identification card).

24      13.   To make purchases and trades on the Exchange, users could transfer

25  bitcoins directly into their Mt. Gox accounts or deposit cash into their accounts by

26  wiring money to Mt. Gox's banking partner—Defendant Mizuho Bank. After

27  receiving the funds, Mizuho Bank would transfer the money into an account that it

28

1  held on behalf of Mt. Gox.

2      14.    Mt. Gox received a transaction fee for each trade made on the Exchange.

3  Upon information and belief, Mt. Gox made tens of thousands of dollars per day in

4  transaction fees from customers on its site.

5      15.    Mizuho likewise received transaction fees on every wire deposit that it

6  processed into the Exchange.

7  ***Mark Karpeles—The Mastermind Behind Mt. Gox.***

8      16.    As President, CEO, and majority shareholder of Mt. Gox, Karpeles

9  controlled all aspects of Mt. Gox's business from the ground up. In fact, Karpeles

10  was involved in nearly every detail of the Exchange, from the technical (Karpeles

11  wrote and designed the software used to run Mt. Gox) to the operational (Karpeles

12  handled all of Mt. Gox's third party negotiations and contracts).

13      17.    Karpeles likewise directed the drafting and dissemination of Mt. Gox's

14  public statements and representations (including those made through its Terms of

15  Use), as well the statements made through Mt. Gox's customer service department. In

16  addition, Karpeles handled all aspects of Mt. Gox's accounting (including its

17  maintenance of user and operational accounts) and banking affairs—personally

18  representing Mt. Gox in its negotiations and discussions with banks and third-party

19  payment processors.

20      18.    As the sole controlling force behind Mt. Gox and the designer of its

21  software, Karpeles was aware that there were security "bugs" in the system in as

22  early as 2011.

23      19.    Rather than correcting the security bugs (or informing users of their

24  existence), Karpeles knowingly concealed the defects from the public and falsely

25  assured users that their bitcoins and money were safe in their accounts.

26  ***Mizuho Bank's Banking Relationship With Mt. Gox.***

27      20.    Defendant Mizuho Bank was Mt. Gox's banking partner in Japan and

28

maintained Mt. Gox's operating accounts. In that capacity, Mizuho Bank facilitated international cash wire transfers into the Exchange and processed user requests to withdraw cash from the Exchange to their outside banks accounts.

21.     To facilitate wire transfers into the Exchange, Mizuho accepted payments that had been wired by users through their outside banks (e.g. Bank of America). Such wire transfers designated Mt. Gox as the beneficiary of the wire and Mizuho as the beneficiary's bank, and included the Mt. Gox user's account number to which the funds were to be directed. After accepting the wire payment, Mizuho thereafter deposited the funds into its account for Mt. Gox with the funds marked on behalf of the specific depositing Mt. Gox user.

22.     To withdraw cash from the Exchange, Mt. Gox users submitted requests online through their Mt. Gox account. Mt. Gox would compile the requests it received—which included such information as the user's banking details and the amount to be transferred—and provide the requests to Mizuho for processing. After receiving the requests, Mizuho would then transfer out the requested amounts to the user's bank.

23.     In mid-2013, Mizuho Bank was the exclusive processor of all bank deposits and withdrawals made by Mt. Gox users located in the United States.

***Mizuho Bank Became Concerned With Karpeles' Business and Implemented New Banking Policies Designed to Coerce Karpeles Into Dissolving Their Partnership.***

24.     Beginning in 2013, Mizuho Bank became increasingly concerned by Mt. Gox's growing transaction volumes amid reports that U.S. authorities were investigating Mt. Gox for business dealings related to money laundering. At the same time, Mizuho Bank faced its own legal troubles at home, with reports surfacing that the bank had knowingly loaned money to organized crime syndicates and was under investigation by Japan's Financial Services Agency.

25.     Accordingly, fearing that the partnership would expose it to further

regulatory scrutiny and cause significant reputational harm, Mizuho Bank decided that it wanted to distance itself from Karpeles and Mt. Gox. However, for its own purposes, Mizuho Bank wanted Karpeles to be the one to officially sever the banking relationship. To that end, Mizuho asked Karpeles to close Mt. Gox's account at Mizuho. He refused.

26.     In order to pressure Karpeles into rethinking his decision and force an end to the banking relationship, Mizuho began implementing a series of new policies in the beginning of 2013. These new policies—all of which were kept secret from the public—were meant to frustrate and disrupt Mt. Gox's business and relationship with its customers.

27.     Ultimately, in June 2013, Mizuho stopped processing international wire withdrawals for Mt. Gox altogether.

28.     Accordingly, in June 2013, Mt. Gox users began to report substantial difficulties in withdrawing cash from their Mt. Gox accounts—wondering online about the source of the delays.

29.     Mizuho knew that if US customers found out about its new, unreasonable banking policies (especially the fact that withdrawals were no longer allowed), they would no longer continue making deposits into the Exchange and it would cease collecting the associated fees. Mizuho also harbored concerns that if its banking policies became publicly known, it could suffer reputational damage or potentially be blamed for losses. Nevertheless, Mizuho continued to accept user deposits into the Mt. Gox Exchange (for which it collected fees on each transaction) through its collapse in February 2014.

30.     On information and belief, Mizuho continued accepting customer deposits in order to further the impression that any withdrawal difficulties were solely attributable to Mt. Gox, so as to avoid drawing public criticism and further scrutiny from regulatory authorities, as well as to continue profiting from the deposit fees that

1 it collected.

2 ***Defendants Concealed Mt. Gox's Operational Difficulties and Continued***

3 ***Accepting Cash Deposits.***

4       31.   In February 2014, Karpeles made numerous representations to the public

5 and to Mt. Gox users that the withdrawal issues were only temporary and that user

6 assets were safe.

7       32.   Karpeles also assured users through the Mt. Gox online Support Desk

8 (which he directed and controlled) that any problems were being dealt with and that

9 there was no cause for alarm. Likewise, users who inquired about withdrawal delays

10 were informed that any withdrawal issues were only temporary and that delays in

11 transaction speeds were merely "due to a change in [Mt. Gox's] banking systems"

12 which had resulted in a "back-log" of requests that needed to be processed." Karpeles

13 even claimed that Mt. Gox was "trying to form relationships with several new

14 banking partners both in Japan and around the world" and "in the process of

15 finalizing even more," meaning that it would "have increased stability and ability to

16 transmit withdrawals going forward."

17       33.   Both Karpeles and Mizuho knew that these statements were false—

18 withdrawal delays were not due to any "backlog" in the system; they were not minor

19 issues and they were not temporary. Rather, withdrawal delays were due to Mizuho's

20 refusal to process international withdrawal requests and its broader efforts to

21 undermine the banking relationship between it and Mt. Gox.

22       34.   Although Mizuho knew that Karpeles was making these false and

23 misleading statements to the public and to his Mt. Gox users, it took no action to

24 correct them. Instead, Mizuho concealed that it was the cause of the Mt. Gox

25 withdrawal delays, concealed the fact that it had implemented banking policies

26 designed to disrupt Mt. Gox's business and relationship with its users, and stood

27 silent while allowing the public to continue being duped.

28

35.     Upon information and belief, Mizuho prohibited Mt. Gox from disclosing that withdrawal difficulties were attributable to Mizuho, or that Mizuho wanted to terminate its banking relationship with Mt. Gox. By continuing to accept deposits, Mizuho further contributed to the false narrative that the Mt. Gox Exchange was operating properly and that problems with withdrawals were not serious or attributable in any way to Mizuho.

36.     On February 7, 2014, Karpeles halted his customers' ability to withdraw bitcoin from Mt. Gox, stating that he was purportedly investigating a "bug" or "technical malfunction" in the Bitcoin network. A few days later, on February 10, 2014, Karpeles claimed that he had supposedly detected "unusual activity" with respect to the Mt. Gox Bitcoin wallets and was investigating a technical issue, called "transaction malleability," which he said involved the ability of third parties to manipulate certain transactions. Karpeles nonetheless assured his customers that "MtGox will resume bitcoin withdrawals to outside wallets once the issue" had been addressed. This statement was also knowingly false, and beyond that, Karpeles concealed the fact that he had been aware of the supposed security "bug" since in 2011.

37.     However, despite that the fact that most users were now unable to withdraw any bitcoins or Fiat Currency from their accounts, and even though both Karpeles and Mizuho knew that full withdrawal functionality (which had been made available to Mt. Gox users prior to Mizuho's decision to halt withdrawals) would never be restored, both Defendants nonetheless continued to accept and profit from more user deposits.

***Karpeles Shut Down Mt. Gox and Declared Bankruptcy.***

38.     On February 24, 2014, the Mt. Gox website "went dark." Customers who visited the site found nothing but a blank page and were unable to view or access their accounts. A message on the Mt. Gox website later notified members that a

"decision was taken to close all transactions *for the time being*." That statement was not true because, at that time, Karpeles was already planning on seeking bankruptcy protection and, on information and belief, was in the process of preparing Mt. Gox's bankruptcy filing.

39.     A few days later, on February 28, 2014, Mt. Gox filed for bankruptcy protection in Japan. In its petition (supported by a declaration from Karpeles), Karpeles revealed that he had known about the security "bug" since May 2011 but that it was not purportedly known "until the end of January 2014 that [the bug] could lead to a large number of unconfirmed transactions and to a risk of illicit withdrawals." The petition further stated that Mt. Gox had discovered "a large discrepancy in the total of deposit balances at those financial institutions which managed said deposits compared to the total amount actually deposited by users and that there was a large shortfall of deposit balances."

40.     During a press conference, Karpeles revealed that Mt. Gox had assets of over $20 million (USD) and liabilities in excess of $65 million (USD)—not including the over $450 million worth of bitcoins it had lost through its supposed security breach. In later bankruptcy filings, he revised those figures to $37.7 million (USD) in assets and $63.9 million (USD) in liabilities. *See* Declaration of Robert Marie Mark Karpeles, ¶ 7, ECF No. 3, No. 14-31229-sgj15 (Bankr. N.D. Tex. Mar. 9, 2014).

41.     In the days that followed, reports emerged suggesting that Karpeles had grossly mismanaged the Mt. Gox Exchange by ignoring known security flaws and user reports of hacking, failing to segregate customer and operational funds in Mt. Gox's account, failing to periodically balance and/or reconcile customer and operational funds, and losing user bitcoins that were purportedly stored in its offline storage.

42.     On June 18, 2014, the Bankruptcy Court in the Northern District of Texas officially recognized Mt. Gox's Japanese bankruptcy proceedings as a foreign

main proceeding under Chapter 15 of the U.S. Bankruptcy Code, effectively staying all pending litigation against it in the United States. *See In re MtGox*, Case No. 14-31229-sgj15 (Bankr. N.D. Tex.).

43.     Tibanne KK likewise declared bankruptcy in Japan in February 2015, with recognition as a Chapter 15 foreign main proceeding being granted on April 2, 2015. *See In re: Tibanne Co., Ltd., a/k/a KK,* Case No. 15-10255 (REG) (Bankr. S.D.N.Y.).

44.     In September 2015, Karpeles was arrested by Tokyo police and formally charged with fraud and embezzlement in connection to his management of Mt. Gox. To date he has not been convicted or acquitted.

## PLAINTIFF'S FACTUAL ALLEGATIONS

### Facts Relating to Plaintiff Joseph Lack

45.     Plaintiff joined Mt. Gox in early 2014 after reading Mt. Gox's representations about the Exchange's security, reliability, and ability to withdraw or deposit bitcoins at any time (substantially similar to the advertisements and representations described in Paragraphs 10-11 above). He was particularly impressed by Mt. Gox's use of two-factor authentication and YubiKeys to ensure account security. To activate his account, he was required to (and did) accept Mt. Gox's Terms of Use, and provide all requested documentation, including government-issued identification.

46.     Upon joining, on January 22, 2014, Plaintiff wire-transferred $40,000 USD to his account at Mt. Gox. To do so, Plaintiff was directed by Mt. Gox to wire the money directly from his local Wells Fargo bank branch to the account that Mizuho held on behalf of Mt. Gox or its owners. Plaintiff was also directed to list his individual Mt. Gox account number on the wire transfer instructions ostensibly so Mizuho and Mt. Gox could identify the deposit as belonging specifically to him.

47.     Following the transfer, Plaintiff waited several weeks for the money to

appear in his Mt. Gox account and for Mt. Gox to acknowledge receipt of his funds.

48.     On February 11, 2014, Plaintiff contacted Mt. Gox regarding his $40,000 and when he would be able to access his money. Mt. Gox responded on February 14, 2014, stating that "withdrawal delays does [sic] not affect transferring funds to your Mtgox [sic] account." It did not answer his specific question regarding the status of his deposit but instead asked for a scanned copy of his wire transfer form. Plaintiff provided this information on February 15, 2014.

49.     Plaintiff continued to wait for the funds to appear in his Mt. Gox account. On February 19, 2014, he contacted Mt. Gox again for a status update, only to be informed, "We continue to check the status of the deposit with our banking team. We will let you know once the funds reaches [sic] your account." Lack responded on February 20, 2014, complaining about these non-responsive emails and demanding to know the location of his money.

50.     Mt. Gox responded on February 20, 2014 stating, "We are yet to receive your deposit. We are facing Bank delays on international deposit and we will surely keep you updated once we receive your deposit."

51.     Upon receiving this message, Plaintiff immediately went to his bank to trace the wire transfer and recall the money.

52.     At no time prior to or during the deposit of his funds, did Mt. Gox or Mizuho notify him that Mt. Gox had suffered any type of "bug," that Mizuho was no longer providing withdrawal services to Mt. Gox users (and thus, there would be no way for him to make wire withdrawals from the Exchange), or that his money would thereafter be permanently inaccessible.

53.     Had Plaintiff known that Mizuho was interfering with Mt. Gox's ability to service users, that he would be effectively unable to make any cash withdrawals from the Exchange, that the security of Mt. Gox had been compromised, or that Mt. Gox intended to go offline and declare bankruptcy, he would not have opened his

account with Mt. Gox or attempted to deposit funds into his Mt. Gox account.

54.     On March 3, 2014, Plaintiff's bank informed him that they were unable to recall the funds since they had already been transferred to Mt. Gox's account at Mizuho on February 3, 2014. His bank provided all the documentation showing that his funds did indeed transfer on February 3, 2014, through Mizuho Bank.

55.     Following bankruptcy, the Mt. Gox website continued to reflect a balance of $0.00 in Lack's Mt. Gox account. The bankruptcy trustee established a process for Mt. Gox customers to submit claims on the bankruptcy estate, but that process required users to submit screenshots of their Mt. Gox accounts reflecting the balance of bitcoin and fiat currency held in their name on the Exchange. He explained his predicament over the phone to individuals purporting to provide customer service to creditors, and they informed him that they would pass his information along to the bankruptcy trustee. Although Lack followed up on this phone call, he was never contacted by anyone affiliated with the bankruptcy trustee.

## CLASS ALLEGATIONS

56.     **Class Definition**: Plaintiff brings this action pursuant to Federal Rule of Civil Procedure 23(b)(3) on behalf of himself and a Class of similarly situated individuals, defined as follows:

> **Mt. Gox Class**: All persons in the United States who had bitcoins or money stored with Mt. Gox on February 24, 2014.

Plaintiff further brings this action pursuant to Federal Rule of Civil Procedure 23(b)(3) on behalf of himself and a Subclass of similarly situated individuals, defined as follows:

> **Deposit Subclass**: All members of the Mt. Gox Class who deposited money into their Mt. Gox account through Mizuho Bank after the date on which Mizuho Bank stopped processing withdrawals.

(The Class and Subclasses are referred to herein as the "Classes".) Excluded from the Classes are (1) Defendants, Defendants' agents, subsidiaries, parents, successors, predecessors, and any entity in which the Defendants or their parents have a controlling interest and their current and former employees, officers, and directors, (2) the Judge or Magistrate Judge to whom this case is assigned and the Judge's or Magistrate Judge's immediate family, (3) persons who execute and file a timely request for exclusion, (4) all persons who have previously had claims similar to those alleged herein finally adjudicated or who have released their claims against Defendants, and (5) the legal representatives, successors, or assigns of any such excluded person.

57.    **Numerosity**: The exact number of the members of the Classes is unknown and not available to Plaintiff at this time, but it is clear that individual joinder is impracticable. On information and belief, and according to documents filed by Mt. Gox in support of their bankruptcy petition,[1] there are likely over 1,000 members in each of the respective Classes. Members of the Classes can be identified through Defendants' records.

58.    **Commonality and Predominance**: There are many questions of law and fact common to the claims of Plaintiff and the members of the putative Classes, and those questions predominate over any questions that may affect individual members of the Classes. Common questions for the Classes include, but are not necessarily limited to the following:

(a)    whether Karpeles adequately managed and safeguarded Plaintiff's and the members of the Classes' bitcoins and Fiat Currency;

(b)    whether Karpeles' conduct constitutes fraud;

---

[1]    *See In re MtGox*, Case No. 14-31229-sgj15, Dkt. 127 at 10-11 (Bankr. N.D. Tex.).

(c)   whether Mizuho's conduct constituted fraud by omission;

(d)   whether Mizuho's conduct constituted fraudulent concealment; and

(e)   whether Mizuho was unjustly enriched by its conduct.

59.   **Typicality**: Plaintiff's claims are typical of the claims of other members of the Classes, in that Plaintiff and the members of the Classes sustained damages arising out of Defendants' uniform wrongful conduct.

60.   **Adequate Representation**: Plaintiff will fairly and adequately represent and protect the interests of the Classes, and has retained counsel competent and experienced in complex class actions. Plaintiff has no interest antagonistic to those of the Classes, and Defendants have no defenses unique to Plaintiff.

61.   **Superiority**: This case is appropriate for class certification because class proceedings are superior to all other available methods for the fair and efficient adjudication of this controversy because joinder of all parties is impracticable. The damages suffered by the individual members of the Classes will likely be relatively small, especially given the burden and expense of individual prosecution of the complex litigation necessitated by Defendants' actions. Thus, it would be virtually impossible for the individual members of the Classes to obtain effective relief from Defendants' misconduct. Even if members of the Classes could sustain such individual litigation, it would still not be preferable to a class action, because individual litigation would increase the delay and expense to all parties due to the complex legal and factual controversies presented in this Complaint. By contrast, a class action presents far fewer management difficulties and provides the benefits of single adjudication, economies of scale, and comprehensive supervision by a single Court. Economies of time, effort and expense will be fostered and uniformity of decisions ensured.

## FIRST CAUSE OF ACTION

## Negligence Against Mark Karpeles

## (On behalf of Plaintiff and the Mt. Gox Class)

62.     Plaintiff incorporates the foregoing allegations as if fully set forth herein.

63.     Karpeles owed Plaintiff and the Mt. Gox Class a duty of reasonable care to employ procedures to detect and prevent the improper access and misuse of Plaintiff's and the Class's bitcoins and Fiat Currency and also to allow them complete access to the same. This duty arose from Karpeles' relationship with Plaintiff and the Mt. Gox Class.

64.     Karpeles breached his duty to the Plaintiff and the Mt. Gox Class by failing to exercise reasonable care in maintaining, protecting, accounting for, and safeguarding the Plaintiff's and the Mt. Gox Class' bitcoins and Fiat Currency within Mt. Gox's control. This included the failure to implement industry-standard accounting procedures or to segregate user accounts from operational funds, as well as the failure to correct security bugs or other vulnerabilities on the Exchange.

65.     Karpeles further acted negligently by failing to implement security procedures to detect and prevent unauthorized access to Plaintiff's and the Mt. Gox Class' bitcoins and Fiat Currency.

66.     As a result of Karpeles' conduct, Plaintiff and the Mt. Gox Class suffered economic injury and other damages, in the form of the price of their bitcoins and Fiat Currency that were accessed, frozen, stolen, and/or misused or that are present in their Mt. Gox accounts and which they cannot access.

67.     But for Karpeles' negligence, Plaintiff's and the Mt. Gox Class' bitcoins and Fiat Currency would not have been compromised and/or lost. The Plaintiff's and Class' bitcoins and Fiat Currency were accessed, frozen, stolen, and/or misused as a result of Karpeles' failure to exercise reasonable care in safeguarding such

1   information by adopting, implementing, and maintaining appropriate data

2   management, accounting, and security measures.

3       68.    The injuries to Plaintiff and the Mt. Gox Class resulting from Karpeles'

4   negligence were reasonably foreseeable, particularly in light of his grossly inadequate

5   accounting, data management, and security processes.

6       69.    Plaintiff and the Mt. Gox Class seek to recover the economic injury and

7   other damages suffered as a result of Karpeles' unlawful conduct, including in the

8   form of the price of the bitcoins and Fiat Currency that were in their Mt. Gox

9   accounts at the time it went dark that is not recoverable under the liquidation

10  proceedings in Mt. Gox's Japanese bankruptcy.

11  **SECOND CAUSE OF ACTION**

12  **Fraud Against Mark Karpeles**

13  **(On behalf of Plaintiff and the Mt. Gox Class)**

14

15      70.    Plaintiff incorporates the foregoing allegations as if fully set forth

16  herein.

17      71.    As described herein, Karpeles engaged in unlawful, deceptive, and

18  unfair conduct.

19      72.    Through Mt. Gox's online marketing materials and advertisements,

20  including its Terms of Use, Karpeles represented to Plaintiff and the Mt. Gox Class

21  that Mt. Gox would, *inter alia*, protect their bitcoins and Fiat Currency, and safely

22  and quickly allow them to buy, sell, trade, or withdraw the same.

23      73.    However, as discussed above, Karpeles did not—and never had any

24  intention to—safeguard or protects his users' bitcoins and Fiat Currency.

25      74.    Thus, Karpeles' representations to Plaintiff and the members of the Mt.

26  Gox Class were knowingly and intentionally false.

27      75.    Knowing that consumers are less likely to do business with companies

28

that fail to adequately safeguard and hold their bitcoins and Fiat Currency or allow them to buy, sell, trade, or withdraw the same, Karpeles made these false representations with the intention that Plaintiff and the members of the Class would rely on them in contracting with Mt. Gox and transferring money and Bitcoin into their accounts.

76.     Karpeles additionally made false representations to Plaintiff and the members of the Class through Mt. Gox's online Support Desk and in its customer service correspondence, which he controlled and directed, as described in Paragraphs 10, 32, and 36, *supra*. In particular, Karpeles falsely claimed that Mt. Gox's withdrawal and deposit issues were only temporary, that withdrawals would soon resume, that he was developing new business relationships with other banks for improved transaction capabilities, and that a security "bug" in Mt. Gox's system was the cause of its suspended withdrawals.

77.     Karpeles further concealed the fact that Mizuho was no longer providing international withdrawal services, and thus, U.S. customers had effectively no means to withdraw deposited cash from the Exchange, and that thousands of user bitcoins had been lost or stolen.

78.     Knowing that users would stop depositing bitcoins and funds in their accounts, and rather, would attempt to withdraw funds or close accounts if made aware of any large-scale loss/theft of coins, Karpeles made the false representations and omissions with the intent that Plaintiff and the members of the Class would rely on them and continue to deposit money and bitcoins into their Mt. Gox accounts and not attempt to withdraw funds and/or close accounts.

79.     Had Karpeles disclosed Mt. Gox's true practices and intentions, Plaintiff and the members of the Class would have stopped depositing cash and/or bitcoins into their Mt. Gox accounts, immediately taken any available steps to remove their assets from the Exchange, or would not have maintained accounts with Mt. Gox at

1   all.

2          80.     Accordingly, Karpeles' fraudulent conduct caused Plaintiff and the Class

3   to suffer actual harm in the amount of the difference between the bitcoins or Fiat

4   Currency that was in their Mt. Gox accounts at the time it went dark and the amount

5   that will be actually returned to them under the liquidation proceedings in Mt. Gox's

6   Japanese bankruptcy.

7          81.     Plaintiff and the Class seek to recover the economic injury and other

8   damages suffered as a result of Defendant Karpeles' unlawful conduct in the form of

9   the price of the bitcoins and Fiat Currency in their Mt. Gox accounts that cannot be

10  recovered.

11                              **THIRD CAUSE OF ACTION**

12                           **Unjust Enrichment Against Mizuho**

13                   **(On Behalf of Plaintiff and the Deposit Class)**

14         82.     Plaintiff incorporates the foregoing allegations as if fully set forth

15  herein.

16         83.     Plaintiff and the Deposit Class conferred a monetary benefit on Mizuho

17  in the form of fees paid for its deposit services.

18         84.     Mizuho appreciates or has knowledge of the benefits conferred upon

19  them by Plaintiff and the Deposit Class.

20         85.     Under principles of equity and good conscience, Mizuho should not be

21  permitted to retain the transactions fees paid by Plaintiff and the Deposit Class,

22  because it knowingly concealed material information from them regarding their

23  transaction deposits (i.e., that they would be unable to thereafter withdraw such

24  money from Mt. Gox's account at Mizuho), which directly resulted in the loss of

25  their monies that they wired to Mt. Gox through Mizuho.

26         86.     Mizuho had a duty to disclose such material information once it stopped

27  processing customer withdrawals.

28

87.     As a result of Mizuho's conduct, Plaintiff and the Deposit Class suffered damages in the form of the transaction fees they paid for Mizuho Bank's wire services.

88.     Plaintiff and the Deposit Class Members have no other adequate remedy at law.

89.     Plaintiff, individually and on behalf of the Deposit Class, seek restitution of all monies Mizuho has unjustly received as a result of its conduct alleged herein, as well as interest, reasonable attorneys' fees, expenses, and costs to the extent allowable, as well as all other relief the Court deems necessary to make them whole.

## FOURTH CAUSE OF ACTION

### Fraud Against Mizuho Bank

### (On Behalf of Plaintiff and the Deposit Class)

90.     Plaintiff incorporates the foregoing allegations as if fully set forth herein.

91.     Defendant Mizuho Bank concealed from and/or failed to disclose to Plaintiff and the Deposit Class Members that it had stopped providing cash wire withdrawal services to Mt. Gox and that Deposit Class Members would thereafter be virtually unable to make cash withdrawals from the Exchange.

92.     These omitted and concealed facts were material because a reasonable consumer would have considered them to be important in deciding whether or not to deposit money into the Mt. Gox Exchange.

93.     Mizuho Bank had a duty to disclose such facts because (i) it contributed to Plaintiff and Deposit Class Members' misapprehension of material facts relating to their ability to make cash withdrawals from the Mt. Gox Exchange, (ii) it was in a position to correct these misapprehensions and had knowledge of the fact that Plaintiff and the Deposit Class Members would be unable to withdraw their money from the Mt. Gox Exchange, and (iii) it knew or should have known that Plaintiff and

Deposit Class Members could not have reasonably been expected to learn or discover the fact that Mizuho Bank had secretly stopped providing withdrawal services to Mt. Gox and that they would thereafter be virtually unable to make cash withdrawals from the Mt. Gox Exchange.

94.     By continuing to facilitate cash deposits into the Exchange even after knowing that it had terminated its withdrawal services to Mt. Gox (and that consumers would thereafter be effectively unable to make cash withdrawals from the Exchange), Mizuho contributed to Plaintiff and the Deposit Class's misapprehension regarding their ability to access their deposited money, thus giving rise to a duty to disclose material facts that would correct their misapprehension.

95.     Mizuho knew that if United States customers found out about its new, unreasonable banking policies (especially, the fact that withdrawals were no longer allowed), they would no longer continue making deposits into the Exchange and Mizuho would cease collecting the associated fees. Despite this knowledge, Mizuho continued to accept user deposits into the Mt. Gox Exchange (for which it collected fees on each transaction) and conceal the truth about its withdrawal policies from Plaintiff and the Deposit Class through Mt. Gox's collapse in February 2014.

96.     On information and belief, Mizuho instructed its own employees not to reveal that it had stopped processing withdrawal requests for users in the United States so as to perpetuate the false impression that Mt. Gox was operating normally. Mizuho did this to protect its reputation so it would not be publicly viewed as contributing to the collapse of Mt. Gox.

97.     Although Mizuho knew that Karpeles was making false and misleading statements to the public and to his Mt. Gox users, *see* Paragraphs 32-37, *supra*, it took no action to correct them. Instead, Mizuho concealed that it was the cause of the Mt. Gox withdrawal delays, concealed the fact that it had implemented banking policies designed to disrupt Mt. Gox's business and relationship with its users, and

stood silent while allowing the public to continue being duped.

98.     Upon information and belief, Mizuho prohibited Mt. Gox from disclosing that withdrawal difficulties were attributable to Mizuho, or that Mizuho wanted to terminate its banking relationship with Mt. Gox. By continuing to accept deposits, Mizuho further contributed to the false narrative that the Mt. Gox Exchange was operating properly and that problems with withdrawals were not serious.

99.     Plaintiff and the Deposit Class did not know that Mizuho had terminated its provision of withdrawal services to Mt. Gox or that Mt. Gox customers would thereafter be virtually unable to make cash withdrawals from the Mt. Gox Exchange. Had Plaintiff and the Deposit Class known the above facts, they would not have wired (or continued to wire) money to Mizuho for deposit into the Mt. Gox Exchange.

100.   Plaintiff and the Deposit Class justifiably relied on the omissions of Mizuho to their detriment. This detriment is evident from the monies lost by Plaintiff and the Deposit Class after being deposited into the Mt. Gox Exchange.

101.   As a direct and proximate result of Mizuho's concealment and omission of material facts, Plaintiff and the Deposit Class have suffered actual damages in the form of currency deposited into Mt. Gox's account at Mizuho after Mizuho's decision to cease processing international withdrawals.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff, Joseph Lack, individually and on behalf of the Classes, pray for the following relief:

(a)     An order certifying the Classes as defined above, appointing Plaintiff as representatives of the Classes, and appointing his counsel as Class Counsel;

(b)     An award of actual damages;

(c)     An award of restitution for Defendants' wrongful conduct;

(d)     An award of reasonable attorneys' fees and costs;

(e)     An award of punitive or exemplary damages;

(f)     An award of interest;

(g)     Such other and further relief that the Court deems reasonable and just.

### JURY DEMAND

Plaintiff requests a trial by jury of all claims that can be so tried.

Respectfully submitted,

**JOSEPH LACK,** individually and on behalf of all others similarly situated,

Dated: January 24, 2018             By:/s/Rafey S. Balabanian
                                    One of Plaintiffs' Attorneys

RAFEY S. BALABANIAN (SBN – 315962)
rbalabanian@edelson.com
J. AARON LAWSON (SBN – 319306)
alawson@edelson.com
Edelson PC
123 Townsend Street, Suite 100
San Francisco, California 94107
Telephone:  (415) 212-9300
Facsimile:  (415) 373-9435

*Counsel for Plaintiff and the Putative Classes*